FILED

2014 Jan-31  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **DIANN WARE o/b/o J.P.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 7:12-CV-3663-VEH** |
| | ) |
| **CAROLYN W. COLVIN,**[1] | ) |
| **ACTING COMMISSIONER,** | ) |
| **SOCIAL SECURITY** | ) |
| **ADMINISTRATION,** | ) |
| | ) |
| **Defendant.** | ) |

---

## <u>MEMORANDUM OPINION</u>

Plaintiff Diann Ware, on behalf of her minor son J.P., brings this action pursuant to Title XVI of the Social Security Act.  She seeks review of a final adverse decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied her application for Supplemental Security Income ("SSI").[2]  Ms. Ware timely pursued and exhausted her administrative remedies

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. ("Any actions instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits ("DIB") or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this opinion should be

available before the Commissioner.  The case is ripe for review under 42 U.S.C. § 405(g).[3]

## FACTUAL AND PROCEDURAL HISTORY

J.P. was nine years old at the time of the second administrative hearing before the Administrative Law Judge ("ALJ") and had completed the third grade.[4] (Tr. 56).  Ms. Ware claims that her son became disabled on February 15, 2006, due to: attention deficit hyperactivity disorder ("ADHD") and headaches.  (Tr.  198, 56-58).

Alice Ware, Ms. Ware's mother, protectively filed a Title XVI application for SSI on behalf of J.P. on August 30, 2007.  (Tr. 188).  On December 5, 2007, the Commissioner initially denied these claims.  (Tr. 101).  Ms. Ware then filed a written request for a hearing on January 2, 2008.  (Tr. 104-06).  An ALJ, Geoffrey S. Casher, held a hearing on April 24, 2009.  (Tr. 40).  He issued a decision denying Ms. Ware's application on July 8, 2009.  (Tr. 91).

On August 17, 2009, Ms. Ware, through her attorney, requested a review of the decision to address additional evidence.  (Tr. 132).   The Appeals Council

considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

[3]  42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

[4]  At the hearing, the mother testified that J.P. was only eight years old.  *Id*.  However, the ALJ confirmed that J.P.'s birthday is February 15, 2001, and the hearing was held on July 28, 2010. (Tr. 56, 70).

remanded the case back to an ALJ on October 26, 2009.  (Tr. 92).  Another ALJ, Charles A. Thigpen, conducted a hearing on the matter on July 28, 2010.  (Tr. 53). On September 17, 2010, he issued an opinion concluding J.P. was not disabled and denying benefits.  (Tr. 35).  Ms. Ware timely petitioned the Appeal Council to review the decision on October 25, 2010.[5]  (Tr. 11).  On July 11, 2012, the Appeals Council denied a review on her claim.  (Tr. 5-8).  The Appeals Council then set this denial aside to consider additional information and re-denied Ms. Ware's request for review on August 22, 2012.  (Tr. 1-4).

On October 22, 2012, Ms. Ware filed a Complaint with this court.  (Doc. 1). The Commissioner answered on January 28, 2013.  (Doc. 6).  Ms. Ware filed a supporting brief (Doc. 8) on March 14, 2013, and the Commissioner responded with her own brief (Doc. 9) on April 15, 2013.  With the parties having fully briefed the matter, the court has carefully considered the record and reverses the decision of the Commissioner.

## STANDARD OF REVIEW

The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Graham v. Bowen*,

---

[5]  The petition, however, was not processed until February 8, 2011.  (Tr. 10).

790 F.2d 1572, 1575 (11th Cir. 1983); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).   This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth*, 703 F.2d at 1239.   This court will determine that the ALJ's opinion is supported by substantial evidence if it finds "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*.   Substantial evidence is "more than a scintilla, but less than a preponderance." *Id*.   The court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citation omitted).   The ALJ's legal conclusions, however, are reviewed *de novo*, because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.   *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993).   If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.   *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## STATUTORY AND REGULATORY FRAMEWORK

To qualify for SSI benefits an individual under age 18, defined as a child under the Social Security Act, must be disabled as defined by the Social Security

Act and the Regulations promulgated thereunder.[6]  *See* 20 C.F.R. § 416.906.  The law defines children's "disability" as "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*.

In determining whether a child is disabled, the Regulations provide a three-step process.  20 C.F.R. § 416.924(a).  The Commissioner must determine in sequence: (1) whether the child is engaged in substantial gainful activity, (2) whether the child has an impairment or combination of impairments that is severe; and (3) whether the child has an impairment that meets, medically equals, or functionally equals the Listing of Impairments.  *Id*.; *see also Henry v. Barnhart*, 156 Fed. App'x. 171, 173 (11th Cir. 2005) (citing 20 C.F.R. § 416.924(a); *Wilson v. Apfel,* 179 F.3d 1276, 1277 n.1 (11th Cir.1999)).  A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.908.  Further, the impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."  *Id*.

---

[6]  The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, as current through December 26, 2013.

5

Functional equivalence is found if the child's impairment or combination of impairments results "in 'marked'[7] limitations in two domains of functioning or an 'extreme'[8] limitation in one domain . . ." 20 C.F.R. §416.926a(a).  In order to determine whether a child's status functionally equals the criteria for an impairment listed in the Regulations, the ALJ must consider functionality in terms of six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i-vi).  If the impairment(s) does not satisfy the duration requirements, or does not meet, medically equal, or functionally equal one of the Listings in the Regulations, a finding of not disabled will be reached and the claim will be denied.  *See* 20 C.F.R. § 416.924(d)(2).

## FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

First, the ALJ found that J.P. was a school-age child and had not engaged in substantial gainful activity since August 30, 2007, the application date.  (Tr. 18). He then found that J.P. had the following severe impairments: ADHD and headaches.  *Id*.  However, he concluded that J.P. did not have an impairment or

---

[7] A "marked" limitation in a domain is found when a child's impairment(s) seriously interfere with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).

[8] An "extreme" limitation in a domain is found when a child's impairment(s) very seriously interfere with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3)(i).

6

combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.

Next, the ALJ determined that J.P. did not have an impairment or combination of impairments that functionally equaled one of the listed impairments. *Id*. Thus, the ALJ ultimately determined that J.P. had not been under a disability, as defined in the Social Security Act, since August 30, 2007, through the date of the decision. (Tr. 35).

## ANALYSIS

The court may reverse a finding of the Commissioner if it is not supported by substantial evidence. 42 U.S.C. § 405(g). "This does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir.1980)).[9] However, the court "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id*. (citation omitted).

The Commissioner may also be reversed if the record shows that she has failed to follow the proper legal framework. *See Lewis v. Callahan*, 125 F.3d

---

[9] *Strickland* is binding precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

1436, 1439 (11th Cir. 1997) ("[The court] review[s] the Commissioner's decision to determine if it is supported by substantial evidence *and based on proper legal standards*.") (emphasis added).  Moreover, in contrast to the substantial evidence standard, "[n]o similar presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999 (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982)).

The court agrees with Ms. Ware's contentions that (1) the Commissioner's decision is not supported by substantial evidence and (2) the ALJ failed to consider whether J.P. met the requirements for Listing 112.05D.

## I. The ALJ's determination that J.P.'s impairment(s) did not functionally equal one of the Listings is not supported by substantial evidence.

In his decision, the ALJ adopted nonexamining, medical expert Dr. Doug McKeown's "designations of the functional domains for [J.P.]." (Tr. 28).  Dr. McKeown's designations, and thus the ALJ's, provided that J.P. had no limitation in acquiring and using information, less than marked limitations in attending and completing tasks, less than marked in interacting and relating with others, no limitations in moving an manipulating objects, no limitations in the ability to care for himself, and no limitations in heal and physical well-being. (Tr. 65-66, 30-35).

8

The ALJ's credibility findings demonstrate the lack of substantial evidence to support the functional domain analysis. Additionally, J.P.'s academic records do not provide substantial evidence to support the ALJ's decision.

### A.    The ALJ's decision to discredit the opinions of two examining physicians was not supported by substantial evidence.

After discussing the evidence, the ALJ first gave the testimony of Dr. McKeown "substantial weight." (Tr. 28). Next, the ALJ afforded the opinion of Dr. Donald W. Blanton, the consultative examiner, substantial weight because he was "qualified to offer an opinion regarding the claimant's mental status[,] and his opinion is generally consistent with Dr. McKeown's opinion and the record." (Tr. 29). It is not clear whether the ALJ then gave the state agency consultant's opinion "some" weight or "substantial" weight. *Id*. ("The undersigned [ALJ] gives some substantial [sic] to the opinion of [the] state agency consultant."). The ALJ justified this decision because the consultant's opinion was "generally consistent with Dr. McKeown's opinion and the record." *Id*.

Finally, the ALJ determined that the opinions of examining physicians Drs. Melissa F. Jackson and John R. Goff were entitled to little weight. He rejected Dr. Goff's opinion because "[h]is evaluation is not totally consistent with the medical evidence and the opinion of Dr. McKeown." *Id*. He similarly discredited Dr.

Jackson's evaluation because it was "not totally consistent with Dr. McKeown." *Id*.

"Generally, [the Commissioner] give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1). The Commissioner will also consider other factors, such as supportability and consistency with the record, in determining the weight to give a medical opinion. *See* 20 C.F.R. § 404.1527(c)(3)-(6). She may then reject a medical opinion if the evidence supports a contrary finding. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). However, "[t]he opinions of nonexamining, reviewing physicians, ... when contrary to those of examining physicians are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence." *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987)).

First, the court notes the ALJ's outright adoption of Dr. McKeown's functional assessment and specific reference to his testimony in *every* physician credibility determination. (Tr. 28-29). This strongly suggests that the ALJ erred by relying solely on Dr. McKeown's opinion to discredit the two examining physicians' reports and to make his functional domain findings. *See Lamb*, 847

F.2d at 703.   Regardless, substantial evidence does not support these determinations.

### 1. Dr. Melissa Jackson

On August 10, 2009, Ms. Prince – J.P.'s school counselor – referred him to Dr. Jackson at the West Alabama Mental Health Center ("WAMHC") for an assessment of his intellectual and academic functioning.   (Tr. 414).   In her summary, Dr. Jackson stated:

> On a measure of intellectual functioning, [J.P.] obtained a full scale IQ of 67, which falls in the Extremely Low range.   He obtained a Total Achievement score of 61, which falls into the Very Low range.   His academic achievement is consistent with his intellectual functioning.   In addition to below average intellectual functioning, [J.P.] also demonstrates concurrent deficits in his present adaptive functioning.   His ability to meet the standards expected for his age is lacking in all areas of adaptive functioning including communication (i.e., receptive, expressive, written), daily living skills (i.e., personal, domestic, community), and socialization (i.e., interpersonal relationships, play and leisure time, coping skills).

*Id*.   J.P.'s IQ and Total Achievement score were "equal to or better than 1% of his same-aged peers."   (Tr. 418, 419).   Dr. Jackson diagnosed J.P. with mild mental retardation[10] and gave him a Global Assessment of Functioning ("GAF") score of 55.[11]   (Tr. 416).

---

[10]   The proper nomenclature is now "intellectual disability."   The "actual medical definition of the disorder," however, has not changed.   *Hickel v. Comm'r of Soc. Sec.*, 13-11172, 2013 WL 5778956, at *1 n.2 (11th Cir. Oct. 28, 2013) (citing 78 Fed.Reg. 46,499, 46,500-01).

[11]   "GAF scores between 51 and 60 reflect moderate symptoms, including moderate difficulty in social, occupational, or school settings."   *Wind v. Barnhart*, 133 Fed. App'x 684, 687 (11th Cir. 2005) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000)).

In his testimony, Dr. McKeown does not specifically discuss Dr. Jackson's evaluation.  He does cite a "school evaluation that was done, apparently in July of 2009 that indicated an IQ of 67."  (Tr. 63).  Presumably, he is referring to Dr. Jackson's examination at the WAMHC.  However, despite Dr. Jackson's mental retardation diagnosis, he testified that "for his long-term treatment at West Alabama Mental Health, the only diagnosis they have for him is … [ADHD]."[12] (Tr. 65).  He also overlooks at least four separate Psychiatric Assessments at WAMHC noting mild mental retardation.[13]   *See* (Tr. 497, 503, 519, 522).  Dr. McKeown's review of the record cannot provide evidence to discredit Dr. Jackson's opinion when Dr. McKeown failed to review Dr. Jackson's actual diagnosis and findings.

The ALJ also noted other "objective evidence" supported discrediting Dr. Jackson's opinion.  (Tr. 29).  Specifically, he noted J.P.'s functional abilities, academic performance, and Individualized Educational Program ("IEP") placement established a higher level of adaptability functioning.  However, as discussed below, this evidence does not provide substantial evidence to support the ALJ's findings.

---

[12]  The ALJ appears to have also made this mistake when he stated "there is no Mental Retardation diagnosis" from WAMHC.  (Tr. 27).

[13]  The confusion likely exists because J.P.'s ADHD counselors only listed ADHD on Axis II.  *See, e.g.*, (Tr. 527).

*2. Dr. John Goff*

On April 22, 2009, Dr. Goff performed a psychological evaluation on J.P. J.P. "obtained a full scale IQ score of 68. That score falls within the mildly retarded range." (Tr. 408). Despite this, Dr. Goff opined, "I really do not think this young fellow is mentally retarded, but he has a very substantial language problem." *Id*. He further stated that:

> [J.P.] is currently technically functioning within the mentally retarded range of psychometric intelligence. He has a very substantial language problem[,] and I think he has a language based learning disability or an expressive language disorder. He can engage in casual conversation, but he has a great deal of difficulty in any sort of structured setting[,] and he does not understand basic language concepts. The combination of the attention problems and his language difficulties represent a substantial problem for this young fellow. I think the attention problem is being treated, but he is not getting much in the way of results. I do not know that the language problem has even been identified at this point, but it is having a negative impact upon his acquisition of basic academic skills.
>
> During this examination this young fellow did not function in an age appropriate manner in terms of his cognition or communication. He has difficulties paying attention and some difficulties expressing himself, which reflect negatively on his ability to deal with social issues and situations. There are obvious difficulties in regard to concentration, persistence and pace, even in the "on-medication" condition.

(Tr. 409-10). Dr. Goff diagnosed J.P. with Attention-Deficit Hyperactivity Disorder, moderate to severe expressive language disorder and "[d]eferred" a diagnosis of intellectual disability under Axis II.[14]

---

[14] "Axis II is for reporting Personality Disorders and Mental Retardation." *Jackson ex rel. K.J. v. Astrue*, 734 F. Supp. 2d 1343, 1374 n.5 (N.D. Ga. 2010) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 28 (4th ed. 2000)).

Dr. Goff also completed a Broad Functional Limitations form.  He opined that J.P. had marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others; no limitations in moving about and manipulating objects; less than marked limitations in caring for himself; and no limitations in health and physical well-being.  (Tr. 411-12).

Dr. McKeown's testimony does not provide substantial evidence, alone or in combination, to reject Dr. Goff's opinion.  Discussing Dr. Goff's opinion, Dr. McKeown testified:

> And the IQ from Dr. Goff was 68, but he deferred a diagnosis on [Axis II].  And, I'm not sure why.  But he did give him a diagnosis on [Axis I] of [ADHD].  It's very possible that the reason that he deferred a diagnosis on [Axis II] and didn't consider mental retardation was because his achievement testing was consistent with low average abilities.

(Tr. 63).

Dr. McKeown misrepresents Dr. Goff's diagnosis.  Dr. Goff deferred an Axis II diagnosis because he believed J.P. suffered from a "moderate to severe language disorder."  (Tr. 410).  Furthermore, Dr. Goff noted that "we do see delays regarding his academic achievement" and that his language problem "was having a negative impact upon his acquisition of basic academic skills."  (Tr. 409).  Dr. McKeown also does not mention or address the fact that Dr. Goff stated that J.P. had marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 411).  Dr. Goff's

assessment indicates that he believed J.P. did *not* have low average abilities.  Dr. McKeown's review (or lack of review) of Dr. Goff's opinion does not support his rejection of it.

### 3. State Agency Consultant

On December 4, 2007, the state agency consultant concluded that J.P. had no limitations in acquiring and using information, less than marked limitations in attending and competing tasks, less than marked limitations in interacting and relating with others, no limitations in moving about and manipulating objects, less than marked limitations in caring for himself, and no limitations in health and physical well-being.  (Tr. 372-73).

In evaluating the opinion of a state agency consultant, the ALJ must consider it as "as opinion evidence."  20 C.F.R. § 404.1527(e)(2)(i).  Thus, the opinion of a nonexamining state agency medical consultant's opinion is "entitled to little weight."  *Lamb*, 847 F.2d at 703.  Furthermore, the consultant determined that J.P. had a lower level of functioning than the ALJ.  He determined that J.P. had less than marked limitations in caring for himself (Tr. 373), while the ALJ determined that J.P. had no limitations in caring for himself. (Tr. 34).

The state agency determination was also performed before the bulk of the evidence was introduced in the record.  In December 2007, the record did not contain the examining physicians' reports, the teacher evaluations, or Ms. Ware's

testimony.   It is based on J.P.'s grandmother's function report and his early treatment for ADHD at WAMHC.  *See* (Tr. 372).   Thus, this opinion does not provide substantial evidence to support the ALJ's decision.

### 4. Dr. Blanton

During the consultative examination with Dr. Blanton, J.P. received a full scale IQ score of 70 with a verbal comprehension score of 69.   Dr. Blanton concluded:

> In summary [J.P.] … scored in the bottom of the borderline intelligence on this administration of the WAIS-IV.  This was felt to be a valid assessment of his current level of intellectual functioning, as there were no distracting factors during the testing session and the patient appeared to put good effort into his work.   Academic achievement testing reveals he is actually performing above his intellectual level and no sign of a learning disability was noted today.  He does have symptoms of ADHD and appears helped by his medication.

(Tr. 487).  He diagnosed J.P. with borderline intelligence and ADHD.  (Tr. 488).

The court recognizes that this diagnosis conflicts with Dr. Jackson's intellectual disability diagnosis and with Dr. Goff's language disorder diagnosis. Furthermore, it is "the province of the ALJ" to weigh this type of opinion evidence and make credibility determinations.   *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (citation omitted).  However, that is *not* what the ALJ did.  He did not mention Dr. Blanton's diagnosis in his rejection of either Dr. Jackson's or Dr. Goff's opinion.  (Tr. 29).   In fact, the ALJ did not find borderline intellectual

16

functioning to be a severe impairment[15] or discuss its effect on J.P.'s functional domains. (Tr. 19, 30-35). Furthermore, Dr. Blanton did not offer an opinion on J.P.'s adaptive functioning. He did assign him a GAF score of 60, but the ALJ assigned the score "little weight." (Tr. 26).

The medical opinions in the record provide conflicting interpretations of J.P.'s impairments and limitations that must be resolved by the Commissioner. However, the opinion evidence does not provide substantial evidence for the adoption of Dr. McKeown's functional domain analysis. Dr. McKeown's review of the opinions of Drs. Jackson and Goff neglected their diagnoses and findings, and Dr. Blanton's opinion does not provide substantial evidence to support the ALJ's determinations.

### B.    The Teacher Evaluations and J.P.'s Grandmother's report do not provide substantial evidence to support the decision of the Commissioner.

The Commissioner argues that the ALJ also used "the reports of [J.P.'s] teachers that were consistent with the evidence as a whole … and the portions of [J.P.'s] Grandmother's report that were consistent with the record" to discredit the physicians' opinions and support his decision. (Def.'s Br. 16). These opinions on J.P.'s functional limitations do not support the ALJ's decision.

---

[15]  This is an odd oversight, considering Dr. McKeown also noted J.P. suffered from borderline intellectual functioning. (Tr. 65).

On February 17, 2009, Ms. Lee – J.P.'s second grade teacher – opined that J.P. had some slight problems acquiring and using information, obvious problems attending and completing tasks, and a few slight problems in interacting with others.  (Tr. 226-27).   In May 2009, Ms. Lee completed another questionnaire regarding his limitations.  She stated that J.P. suffered from marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 249).

On January 22, 2010, Ms. Mills – J.P.'s third grade teacher –noted that J.P. did not pay attention, follow directions, complete assignments, or participate in class.  (Tr. 22, 253-55).   She stated that "[h]is functioning level is low without assistance from the Resource Teacher."  (Tr. 255).   On July 15, 2010, Ms. Prince completed a teacher questionnaire.  She stated that J.P.'s behavior was "not age appropriate!"   (Tr. 298).    She estimated that J.P. had extreme limitations in acquiring and using information and attending and completing tasks.  (Tr. 300).

J.P.'s grandmother stated that J.P. could "deliver telephone messages, repeat stories …, tell jokes or riddles accurately, and talk with family and friends."  (Tr. 28).   She "reported that the claimant does not have any physical limitations."  *Id*. However, she also noted that J.P. cannot explain why he did something, read and understand simple sentences, write a simple story, tell time, make correct change, tie his shoelaces, take a bath or shower without help, wash his hair, write in

18

longhand, obey safety rules (i.e. looking before crossing the street), and choose his own clothes.  (Tr. 211-15).

The ALJ gave "some weight" to Ms. Lee and Ms. Mills but "little weight" to Ms. Prince.   (Tr. 29).   To discredit these opinions, the ALJ first cited Dr. McKeown.  *Id*.  The ALJ also cited J.P.'s grades, his IEP report and unspecified "other objective evidence."  *Id*.  The ALJ also found the grandmother's assessment "partially credible" for unspecified reasons.  *Id*.

Even assuming these credibility determinations are supported by substantial evidence, the discredited reports cannot be a basis to reject the physicians' opinions or to support the ALJ's functional domain analysis.  Misses Lee, Mills and Prince all opined that J.P. suffered from greater functional limitations than the ALJ.    J.P.'s  grandmother  also  stated  that  J.P.'s  impairments  caused  greater limitations.  For example, a school-age child should be able to "tell[] time[] and mak[e] change" if he has no restrictions in acquiring and using information.  20 C.F.R. § 416.926a(g)(2)(iv).  J.P.'s grandmother stated that he could *not* do these things.  (Tr. 211-15).  Yet, the Commissioner attempts to use these reports to discredit Drs. Jackson and Goff and to support his functional domain analysis.

The Commissioner unpersuasively argues that the ALJ used the parts "that were consistent with the record."  (Def.'s Br. 16).  The ALJ, then, should use that

part of the record to support his credibility determinations and functional domain analysis, not the reports he found incredible.

### C.   J.P.'s academic record does provide substantial evidence to support the Commissioner's decision.

The ALJ also cited J.P.'s academic performance to support his functional domain analysis and credibility findings.  Discussing J.P.'s academic progress, the ALJ cited "notable improvements" from "the first to second nine weeks of the 2nd grade."  (Tr. 22).  He additionally pointed to various weekly evaluations from the third grade demonstrating that J.P. "did not always earn poor grades."  (Tr. 23).  He noted that Ms. Lee stated that, with help, J.P. could academically perform at the same level as other students and Ms. Mills opined he could do better if he tried.  *Id.* Furthermore, J.P.'s IEP stated that "continued placement in the regular education classroom … would best suit his needs."  (Tr. 23).   Dr. McKeown also reported that J.P.'s academic achievement testing "was solid average.   He was reading completely on grade level, spelling on grade level, and about three quarters of a year behind on arithmetic."  (Tr. 64).

However, the IEP plan also reduced the number of concepts presented at a time, broke assignments into shorter segments, allowed him to re-do any unacceptable work, afforded him extra time to complete his work, and provided thirty minutes of math and reading intervention and another thirty minutes of

general instruction daily.  (Tr. 283, 286).  Many of J.P.'s records indicate that his grades were "with accommodation" or the "teacher's help."  (Tr. 296, 277).  While the ALJ correctly noted some good grades for J.P., the record also contains numerous poor grades.  *See* (Tr. 274, 275, 276, 277).  Further, Ms. Prince reported that J.P. was "not on level with reading and math," had "grades … below other students in the classroom," and needed the special education teacher to complete his work.  (Tr. 298-99).

Like the medical diagnoses, the academic record contains somewhat conflicting evidence as to the degree of J.P.'s functional limitations.  However, it does not provide substantial evidence to support a rejection of two examining physicians' opinions, three teacher evaluations, and J.P.'s grandmother's function report in favor of a state agency consultant without access to the majority of the record and a nonexamining physician.  Substantial evidence does not support the ALJ's functional domain analysis.

## II.   The ALJ did not follow the proper legal framework in his decision when he failed to consider whether J.P. medically met Listing 112.05D.

In order to meet Listing 112.05D for intellectual disability, Ms. Ware "must prove that her son meets both the requirements in the diagnostic description of the introductory paragraph and the listed severity criteria in 112.05D."  *Gray ex rel. Whymss v. Comm'r of Soc. Sec.*, 454 Fed. App'x 748, 750 (11th Cir. 2011) (citing

20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.00A).  The diagnostic description requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.05.  Further, Listing 112.05D requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In determining that J.P. did not meet a Listing, the ALJ did not mention or explain why J.P. did not meet Listing 112.05D.  The Eleventh Circuit has stated:

> [I]n order to make [the court's] review meaningful, [the court] must be able to determine what statutory and regulatory requirements the ALJ did in fact apply—where [the court] cannot do that we must vacate and require a remand to the [Commissioner] for clarification.

*Jamison v. Bowen*, 814 F.2d 585, 589 (11th Cir. 1987) (citation omitted) (holding that the ALJ did not properly consider the claimant's medical condition as a whole).  In an unpublished opinion, the Eleventh Circuit applied this reasoning to the adult intellectual disability Listing:

> [T]he ALJ said that there was no medical evidence supporting a finding of listing-level severity as to any impairment, but in this explanation, the ALJ did not mention the mental retardation [intellectual disability] listing, Sheffield's IQ, Sheffield's educational history or current activities, or Sheffield's argument from the hearing that he met the mental retardation listing at § 12.05(C). On this record, we cannot effectively ensure that the ALJ properly applied the relevant regulatory requirements. … Accordingly, we vacate and remand for further findings.

*Sheffield v. Comm'r of Soc. Sec.*, 513 Fed. App'x 840, 842-43 (11th Cir. 2013).

In the present case, the ALJ did not mention Listing 112.05D, accept or reject J.P.'s multiple IQ tests,[16] consider whether his headaches and ADHD qualified as an additional impairment, or discuss the diagnostic requirements for the intellectual disability Listings.   The Eleventh Circuit, in an unpublished decision, found that the ALJ's Decision can contain an implicit finding, when "substantial record evidence supports that [the claimant's] condition did not actually or functionally meet Listing 112.05." *Turberville ex rel. Rowell v. Astrue*, 316 Fed. App'x 891, 893 (11th Cir. 2009) (citing to the ALJ's functional domain analysis and other "conclusions").   However, as discussed above, in this case the ALJ's explicit findings are *not* supported by substantial evidence.   Therefore, the court will "remand to the [Commissioner] for clarification." *Jamison*, 814 F.2d at 589.

## CONCLUSION

Based upon the court's evaluation of the evidence in the record and the parties' submissions, the court concludes that the decision of the Commissioner is not supported by substantial evidence and that she failed to apply the proper legal standards in arriving at it.   Accordingly, the decision of the Commissioner will be reversed and remanded by separate order.

---

[16] Although J.P. has three IQ scores meeting the listing's requirements, these scores are not conclusive indicators of intellectual disability. *See Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).   The ALJ may accept or reject an IQ score based on the other evidence in the record. *Id*.

23

**DONE** and **ORDERED** this the 31st day of January, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge